UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JASMINE SWEEZER,<br>    Plaintiff, | )<br>)<br>) | |
| vs. | ) | No. 17-1476 |
| | ) | |
| WEXFORD HEALTH<br>SOURCES, INC., et.al.,<br>    Defendants | )<br>)<br>)<br>) | |

SUMMARY JUDGMENT ORDER

This cause is before the Court for consideration of Defendant Wexford Health Sources Supplemental Motion for Summary Judgment. [54]. For the following reasons, the motion is DENIED. [54].

I.  BACKGROUND

Plaintiff currently has four claims before the Court alleging the Defendants delayed diagnosis and treatment for a brain tumor at Illinois River Correctional Center. (Comp., [1]).  Specifically, Count I alleges an Eighth Amendment official capacity claim against Wexford Health Sources based on a policy or custom of denying or delaying outside referrals or testing. (Comp., [1], p. 7-9).  Count II claims Defendant Nurses Ashley Phillips and seven Jane or John Doe Nurses violated Plaintiff's Eighth Amendment rights when they were deliberately indifferent to his serious medical condition. (Comp., [1], p. 10-11). County III repeats the Eighth Amendment claim

against Defendant Dr. Kurt Osmundson and Count IV alleges all Defendants violated the state law tort of medical malpractice.[1]

The Court denied the Defendants' motion for summary judgment on November 20, 2020. *See* November 20, 2020 Summary Judgment Order. However, the parties' briefing on the allegations against Defendant Wexford left some confusion over the basis of those claims.

For instance, although discovery was closed, there were still several Jane and John Doe Defendants in the case. In addition, none of the identified Defendants were involved in Plaintiff's care in the hours before he required emergency treatment at an outside hospital. The Court noted even if the Plaintiff could now identify the Doe Defendants, "once the statute of limitations period expires, [plaintiff] cannot amend his complaint to substitute a new party in the place of 'John Doe.'" *Gomez v. Randle*, 680 F.3d 859, 864 n.1 (7th Cir. 2012). "Furthermore, it would be difficult for Plaintiff to explain the delay in amending his complaint, the delay in serving the Defendants, and the potential prejudice to the Defendants at this stage of the proceedings." November 20, 2020 Summary Judgment Order, p. 26, *citing Campania Mgmt. Co. v. Rooks, Pitts & Poust*, 290 F.3d 843, 848-49 (7th Cir. 2002); *King v. Cooke*, 26 F.3d 720, 724 (7th Cir. 1994).

Therefore, it appeared any motion to amend to add the names of the Doe Defendants would be futile. Since the issue had not been addressed, the Court allowed

---

[1] The Court previously dismissed Plaintiff's Eighth Amendment *respondeat superior* claim against Defendant Wexford. *See* July 8, 2019 Case Management Order.

Plaintiff 21 days to file a brief or the Doe Defendants would be dismissed. In addition, since neither side addressed the relation of the Doe Defendants to the official capacity claim and the basis of the claim was unclear, the Court also allowed Defendants an opportunity to file a supplemental summary judgment motion to clarify the issues prior to trial.

Plaintiff has not filed any further briefing regarding the unnamed Defendants, and therefore all Jane of John Doe Defendants will be dismissed. Count II will proceed against Defendant Nurse Phillips only.

Defendant Wexford has now filed a supplemental dispositive motion and Plaintiff has responded. Neither side has alleged any additional undisputed facts and therefore the Court relies on the previous statement of facts as noted below.

## I.    FACTS

Plaintiff was incarcerated at Illinois River Correctional Center within the Illinois Department of Corrections (IDOC) during the relevant time frame. Defendants Dr. Osmundson, Dr. Shah, and Nurse Phillips were all employed by Defendant Wexford Health Services (Wexford) to provide medical care to inmates. Dr. Osmundson was the Medical Director at Illinois River.

Plaintiff's medical records indicate sporadic complaints of headaches and dizziness over several years. *See ie.* (Plain. Resp., Bates #7, 9/9/11, headaches; Bates #251, 9/12/11, headaches). On June 21, 2012, Plaintiff told medical staff he had suffered with a migraine for seven days. He described pain at the top of his skull and behind his ears and reported over-the-counter medication was not helping. Plaintiff

3

also informed medical staff his grandmother had migraines and ultimately died of a brain tumor. Plaintiff was concerned he might have the same problem. (Plain. Resp., UMF # 4: Bates #258).

On June 27, 2014, Plaintiff saw nursing staff after he complained he was dizzy and lightheaded. Plaintiff said the problem had lasted for more than a month. (Def. Mot., Bates #280). Medical staff noted Plaintiff's ear drum was yellow and possibly perforated.

Defendant Dr. Shah saw Plaintiff for a follow-up appointment on July 9, 2014. The doctor's notes are not legible, but Defendant Dr. Osmundson says the doctor indicated Plaintiff's ear infection was resolving and he encouraged Plaintiff to drink more fluids. (Def. Mot., Osm. Aff., p. 3). Defendant Dr. Shaw also noted Plaintiff stated he was still dizzy. (Def. Mot., Bates #282).

Nursing staff contacted Defendant Dr. Osmundson on July 10, 2016 reporting Plaintiff had a headache, felt dizzy, was vomiting, and had diarrhea. Plaintiff stated he had suffered with headaches, dizziness, and lack of energy for five days, but he did not report the problems until July 9, 2016. (Plain. Resp., Bates #336). Defendant Dr. Osmundson was contacted on July 10, 2016 when Plaintiff's symptoms worsened. (Plain. Resp., Bates #337).

The Defendant was not at Illinois River Correctional Center at the time. Therefore, based on the nurse's description of Plaintiff's symptoms, the Defendant ordered four milligrams (mg) of an anti- nausea medication called Zofran to be taken every six hours as needed for the next 24 hours. Defendant Dr. Osmundson also

4

ordered medical staff to admit Plaintiff to the infirmary for observation until the doctor could examine him the next day.

Defendant Dr. Osmundson met with Plaintiff on July 11, 2016.  Plaintiff reported he had less of a headache and no vomiting or nausea for about 24 hours. (Def. Mot., Osm. Aff., p. 3).  The Defendant noted no other signs of distress and "no focal deficits on neurological examination." (Def. Mot., Osm. Aff., p. 3). Plaintiff had a normal gait, "no gross motor or sensory impairment." (Def. Mot., Osm. Aff., p. 3).  In addition, he had good strength, he was able to extend and move his arms and legs, and he had normal reflexes.  Dr. Osmundson assessed Plaintiff with "headaches with questionable aura." (Def. Mot., Osm. Aff., p. 3).  The Defendant does not explain this statement further.

> However, due to the lack of findings on neurological examination suggestive of a mass effect in the brain combined with the fact (Plaintiff's) symptoms were improving, I believed him to be suffering from a primary migraine headache, rather than one caused by a secondary problem like a brain mass. I would not expect a brain mass to cause headaches with no neurological component and then improve on its own. (Def. Mot., Osm. Aff., p. 3).

Defendant Dr. Osmundson released Plaintiff from the infirmary with a prescription for 500 mg of Tylenol three times a day and one to two Excedrin Migraine pills three times a day as needed.  The Defendant also ordered additional testing including a complete blood count to check for anemia and a complete metabolic panel to check for kidney, liver, or other blood chemistry problems.  The doctor also requested thyroid labs to see if Plaintiff had any thyroid disfunction.  Finally, the

Defendant Doctor asked for a follow-up appointment which was scheduled for July 19, 2016. (Def. Mot., Osm. Aff., p. 3-4).

Defendant Dr. Osmundson reviewed Plaintiff's lab results on July 14, 2016 and they were all within normal limits. The Defendant had no further involvement with Plaintiff's medical care during the relevant time period.

In the early morning hours of July 17, 2016, correctional staff sent a "Code 3" or medical emergency notification to Illinois River medical staff. Plaintiff hit the emergency call button due to a severe headache. (Plain. Resp., Bates #76; Swe. Aff., p. 2).

Defendant Nurse Phillips went to Plaintiff's cell with Lieutenant Botrell. (Def. Mot., Phil. Aff., p. 2); (Plain. Resp., ARB Bates #80; Swe Aff., p. 2). The parties disagree about what happened next.

Defendant Nurse Phillips says because she was responding to an emergency, she did not have Plaintiff's medical chart with her.

> (Plaintiff) was yelling that he was hungry but that he was afraid to eat for fear of vomiting from his anti-nausea medication (Zofrin). He was requesting to see Dr. Osmundson to get more medications. I encouraged (Plaintiff) to go to the dining hall and eat bland foods. I verified he had two Zofrin pills left. I conducted a physical examination of (Plaintiff), finding no abdominal tenderness and no signs of dehydration. (Def. Mot., Phil. Aff., p. 2).

The Defendant says Plaintiff was agitated during her encounter with him, but she does not recall him complaining of any particular symptoms such as headaches. Nonetheless, the Defendant Nurse's notes confirm Plaintiff said his medications were not working and he wanted to be sent to the hospital. (Plain. Resp., Bates #347). This

6

was Defendant Phillips last contact with Plaintiff before his hospitalization. (Def. Mot., Phil. Aff., p. 2).

Plaintiff tells a different version of their encounter. Plaintiff claims the Defendant Nurse never entered his cell even when he asked for medical help. (Plain. Resp., ARB Bates #80; Swe. Aff., p. 2). Plaintiff says the nurse told him to sign up for sick call, but Plaintiff told her he did not think he would make it to sick call. Both Defendant Nurse Phillips and Lieutenant Botrell said Plaintiff was faking and they tried to close his cell door. (Plain. Resp., ARB Bates #80; Swe Aff., p. 2). Plaintiff says "out of desperation" he refused housing and was taken to segregation. (Plain. Resp., ARB Bates #80; Swe Aff., p. 2). At this point, Plaintiff says he asked for medical help for his headache, but the Lieutenant again told him to stop faking it.

The parties agree Defendant Nurse Phillips verified Plaintiff was scheduled to be seen by a nurse during sick call the next morning, and Plaintiff was seen by a different nurse shortly before ten the next morning. (Def. Mot., Phil. Aff., p. 2). At this point, Plaintiff was hitting himself in the head and screaming. Plaintiff appeared confused and described severe pain "all over head." (Plain. Resp., Bates #349). Plaintiff also had blurred vision as well as vomiting and nausea.

Plaintiff was moved to the infirmary for observation shortly after ten on the morning of July 17, 2016. Two hours later, Plaintiff was continually banging his head and face on the door screaming "headache, headache" or "help me." (Plain. Resp., Bates #350). Plaintiff also appeared confused and disoriented when he met with mental health staff and he had visible injuries to his face and nose. (Plain. Resp., Bates #7-8).

7

Shortly before five that evening, Plaintiff was again observed screaming "my head, my head" and Plaintiff hit his head against a wall. (Plain. Resp., Bates #353). Plaintiff was bleeding from both nostrils, his right eye was swollen shut, and he had a large hematoma in the middle of his forehead. (Plain. Resp., Bates #353).

Plaintiff was ultimately taken to the hospital at about 5:30 p.m. in the evening. During the transport, Plaintiff's symptoms worsened when he began projectile vomiting. (Plain. Resp., Bates #354).

No medical provider at Illinois River ever requested imaging of Plaintiff's head prior to his hospitalization.

At the hospital, Plaintiff was diagnosed with a brain mass known as a colloid cyst which blocked the flow of cerebrospinal fluid within his brain and caused a condition known as hydrocephalus resulting in increased intracranial pressure. (Def. Mot., UMF #35). Plaintiff was also diagnosed with severe soft tissue swelling over the nose and forehead and several fractures to his sinuses and nasal bones. (Plain. Resp., Hosp. Rec.).

Neither Defendants nor Plaintiff provide any additional information concerning a colloid cyst in the brain. Medical sources describe it as rare, benign growth which can often causes no symptoms until it grows to the point that it is blocking the normal flow of cerebrospinal fluid which can cause headaches, memory or concentration difficulties, and double vision.[2]

---

[2] *See* Pacific Brain Tumor Center, COLLOID CYST, https://www.pacificneuroscience institute. org/brain-tumor/conditions/colloid-cyst/,(last updated November 20, 2020): Weill Cornell Brain and

## II. LEGAL STANDARD

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A movant may demonstrate the absence of a material dispute through specific cites to admissible evidence, or by showing that the nonmovant "cannot produce admissible evidence to support the [material] fact." Fed. R. Civ. P. 56(c)(B). If the movant clears this hurdle, the nonmovant may not simply rest on his or her allegations in the complaint, but instead must point to admissible evidence in the record to show that a genuine dispute exists. *Id.; Harvey v. Town of Merrillville*, 649 F.3d 526, 529 (7th Cir. 2011). "In a §1983 case, the plaintiff bears the burden of proof on the constitutional deprivation that underlies the claim, and thus must come forward with sufficient evidence to create genuine issues of material fact to avoid summary judgment." *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010).

At the summary judgment stage, evidence is viewed in the light most favorable to the nonmovant, with material factual disputes resolved in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists when a reasonable juror could find for the nonmovant. *Id.*

## IV. ANALYSIS

---

Spine Center, COLLOID CYSTS, https://weillcornellbrainand spine.org/condition/colloid-cysts/symptoms-colloid-cyst, (last visited January 2021); U.S. Department of Health & Human Services, National Institute of Health, Genetic and Rare Diseases, COLLOID CYSTS OF THE THIRD VENTRICLE, https://rarediseases. info.nih.gov/diseases/9878/colloid-cysts-of-third-ventricle, (last visited April 7, 2021).

A private corporation like Wexford which has contracted to provide medical care to inmates can be held liable under 42 U.S.C. §1983 if it has a policy or practice which causes the violation of a prisoner's constitutional rights. *See Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 664 (7th Cir. 2016); *Shields v. Illinois Dept. of Corrections*, 746 F.3d 782, 789 (7th Cir. 2014). Plaintiff must establish: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019), *cert. denied*, 140 S. Ct. 51 (2019), *quoting Estate of Sims ex rel. Sims v. Cty. of Bureau*, 506 F.3d 509, 515 (7th Cir. 2007).

In addition, Plaintiff must present evidence to establish Wexford's policy was the "'direct cause' or 'moving force' behind the constitutional violation." *Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917, 927 (7th Cir. 2004), *quoting Estate of Novack ex rel. v. County of Wood*, 226 F.3d 525, 530 (7th Cir. 2000). "The critical question … remains this: is the action about which the plaintiff is complaining one of the institutions itself, or is it merely one undertaken by a subordinate actor?" *Glisson v. Indiana Dep't of Corrs.*, 849 F.3d 372, 381 (7th Cir. 2017).

Finally, the Seventh Circuit has held "a municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an inconsistent verdict." *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 305 (7th Cir. 2010)

(emphasis in original); *see also Flournoy v. Estate of Obaisi*, 2020 WL 5593284, at *14 (N.D.Ill. Sept. 18, 2020)("A corporation may be liable absent individual liability where the institutional policies themselves show deliberate indifference to inmates' medical needs.").

Before addressing whether the official capacity claim against Wexford can survive summary judgment, the Court must first clarify the basis of the claim. Plaintiff alleges "Wexford maintained a custom or practice of denying and delaying care, refusing or delaying referral of ill inmates to the on-site physician or off site to the emergency room even in the face of a deteriorating condition, all as part of a systemic culture of providing minimalist care." (Plain. Resp., [55], p. 3). The time frame of Plaintiff's allegation spans "over the course of months or years leading up to July 17, 2016 and then over the course of several hours on July 17, 2016." (Plain. Resp., [55], p. 2).

Defendant Wexford argues the claim is limited to the events which occurred on July 17, 2016 because the Court found the record did not support an official capacity claim based on any prior incidents. (Def. Mot., [54], p. 7). The Defendant is mistaken.

Plaintiff argued his condition was ignored long before July 17, 2016. For instance, no medical provider sent Plaintiff for outside imaging despite medical records demonstrating Plaintiff suffered headaches over a long period of time including a week-long headache as far back as 2012. Plaintiff informed medical providers his relative suffered headaches and died of a brain tumor. In addition, Plaintiff claimed he had multiple episodes of headaches with dizziness.

The Court did state "the record presented does not support *each* of these assertions." November 29, 2020 Summary Judgment Order, p. 17 (emphasis added). The Court had previously pointed to the various medical records Plaintiff cited which noted dizziness without any link to headaches. *See* November 29, 2020 Summary Judgment Order, p. 11, *citing* (Plain. Resp., 8/19/14, Plaintiff reports ear pain and dizzy in morning, (Bates #287); 8/24/14, red, inflamed ear with pain and dizziness (Bates #289); 9/18/14, reports drowsy and dizzy after taking medication, (Bates #292); 11/12/15, eye drops make Plaintiff feel drowsy and dizzy, (Bates #320)). However, Plaintiff did provide documentation demonstrating medical staff knew he had a history of headaches including headaches which lasted long periods of time, and documentation Plaintiff had reported a relative who died due to a brain tumor.

Furthermore, Plaintiff presented evidence showing Defendant Dr. Osmundson did not order a CT scan in the days prior to Plaintiff's emergency hospitalization despite Wexford's Neurology Guidelines and despite no known cause for his symptoms. Therefore, Plaintiff may proceed with his official capacity claim based on the conduct of medical providers prior to July 17, 2016.

Defendant Wexford also argues Plaintiff cannot include the conduct of unnamed medical staff during the hours of July 17, 2016, because Plaintiff never made this allegation in his complaint, nor did he clarify his claim during discovery. The Court again disagrees.

Plaintiff's complaint, in great detail, lists his contacts with medical staff on July 17, 2016, from the moment a "Code 3" was called at 4:30 a.m., to his nurse sick call visit,

to his hours in the medical infirmary before he was taken to the hospital at 5:30 p.m. (Comp., [1], p. 6).

> Policy-making officials at Wexford knew, or in the exercise of reasonable supervisory activities, should have known that Plaintiff required immediate intervention and referral 'outside' the prison system for emergency specialty consultation.  Nevertheless, Defendant failed to permit Plaintiff to see a physician in the health care unit or a specialty physician outside the prison system until his condition became a life-threatening emergency. (Comp., [1], p. 9).

In response to interrogatories, the Plaintiff referred Defendant back to the allegations in his complaint, the specific medical records, and report from Plaintiff's Medical Expert.  Dr. Melvin Ehrhardt clarified the role of the Doe Defendants on July 17, 2016 claiming each nurse failed to timely notify or consult with a physician, failed to perform a proper examination, failed to recommend an outside examination, and failed to transfer to an outside provider for medical care.  Therefore, the conduct of the medical staff both before and during July 17, 2016 formed the basis of Plaintiff's claim alleging Wexford had a policy or practice which lead to the violation of Plaintiff's constitutional rights.

The clarification of the official capacity claim refutes some of Defendant Wexford's remaining arguments in support of summary judgment.  For instance, the Defendant maintains a claim limited only to July 17, 2016 fails to demonstrate a widespread practice or custom of denying proper care. However, Plaintiff has provided sufficient evidence based on treatment both before and during the events of July 17, 2016.

13

The Defendant also argues Plaintiff has not provided evidence demonstrating the unidentified medical staff Plaintiff encountered on July 17, 2016 were Wexford employees. Plaintiff alleges he first met with Nurse Phillips, then met with a second nurse during sick call, and was subsequently housed in the infirmary until his transport to the hospital. Medical staff are employed by Wexford and medical records from this time period are in the record. The Court has no reason to believe Plaintiff was instead provided medical care by Illinois Department of Corrections employees and Defendants have not presented any evidence to demonstrate otherwise.

Defendant Wexford repeats the same arguments alleging insufficient evidence of a widespread practice or custom and insufficient evidence the medical staff were Wexford employees in support of the motion for summary judgment on the state law medical malpractice claims. The Court has explained why the arguments do not support summary judgment.

IT IS THEREFORE ORDERED:

1) All remaining "Unknown" Jane or John Doe Defendants are dismissed. *See* November 20, 2020 Summary Judgment Order, p. 25-26.

2) The supplemental motion for summary judgment on the official capacity and state law claims against Defendant Wexford Health Source is DENIED pursuant to Federal Rule of Civil Procedure 56. [54].

Dated this 13th day of April, 2021.

                                                      s/ Jonathan E. Hawley
                                       _____
                                                JONATHAN E. HAWLEY
                                    UNITED STATES MAGISTRATE JUDGE